# G. W. MAYNARD, APPELLANT, *v.* C. W. NEWMAN ET AL., RESPONDENTS.

To coin money means to fabricate it out of metalic substances.

Money is anything which passes current as a general medium of exchange and measure of values.

Paper money is different from negotiable securities.

The power of the National Government to issue treasury notes is not derived from the special power to coin money, but is an incident to the more general powers of the Government.

This power has been exercised heretofore and sustained by all branches of the Government, and is no longer an open question.

Sections 8, 9 and 10 of Article I. of the United States Constitution commented on and construed.

In interpreting laws, the intention of the legislative body will be carried out, and it will not be lightly presumed that the law-making power contemplated the law should be used as a cloak for fraud and oppression.

APPEAL from the First District Court of the First Judicial District of the Territory of Nevada, Storey County, Hon. J. W. NORTH presiding.

*Thomas Sunderland*, Counsel for Appellant.

*Reardon & Hereford*, Counsel for Respondents.

At, or a short time after this case was submitted to the Court on briefs, the case of *Burling* v. *Driscoll & Goodman* was also submitted, involving nearly the same questions as in this case. Elaborate briefs were filed in that case.

We were also furnished with the briefs which were filed in the Supreme Court of California, in the cases of *Lick* v. *Faulkner*, *Loring* v. *Cooper*, *Higgins* v. *Bear River and Auburn Water and Mining Company*, and *Wallace* v. *Collins*, all involving the constitutionality of the law of Congress which is discussed in this opinion.

We examined the whole of these briefs before writing our opinion, but the great length of them precludes their being inserted in this report. To condense such a mass of briefs would take more time than we have at our disposal.

The principal points made in the argument of the constitutionality of the law are noticed in our opinion.

Opinion by BEATTY, J., full Bench concurring.

The defendants, Newman and A. C. Hamilton, in May, 1862, executed and delivered a note in the following words:

" Six months after date we, or either of us, promise to pay to the order of John R. Harrold ten thousand dollars, for value received.                          " C. W. NEWMAN,
                                              " A. C. HAMILTON.
" GOLD HILL, May 1st, A. D. 1862."

This note passed by assignment to plaintiff, and he obtained judgment against the defendants for nine thousand eight hundred and nineteen dollars and sixty cents—the amount of the note and interest, less a payment of one thousand one hundred dollars made thereon before suit. After judgment

defendants tendered to plaintiff the full amount of debt, interest and costs, in•United States legal tender notes. The plaintiff refused to accept them in payment of the debt. The defendants then paid them into Court, or paid them to the Clerk of the Court wherein the judgment was rendered. Upon proper notice, the plaintiff was brought into Court, and again refused to accept the legal tender notes in payment of his debt. The Court then, on motion of defendants, ordered the Clerk to satisfy the judgment as of record. From this order the plaintiff appeals, and the only point made before this Court is that the law of Congress of the 25th of February, 1862—in regard to legal tender notes—is unconstitutional and void.

In determining this question it may not be unprofitable or inappropriate to revert to the history of the formation of this Government prior to the adoption of the present Constitution. Prior to the year 1775 the territory which was first embraced within the United States Government constituted a part of the British Empire. This territory embraced thirteen distinct municipal corporations, each having a local Legislature, and exercising certain local and municipal authority, but all acknowledging the supremacy of the British Government, and making no claim to sovereignty. In 1774 a Congress, consisting of delegates appointed by and representing most of the thirteen colonies, met for the purpose of devising means for the redress of certain grievances of which they complained. In 1775 an organized resistance was made to the British authority, and in the following year, July 4th, 1776, the thirteen colonies declared their independence of Great Britain. The inauguration of resistance, the organization of armies, the Declaration of Independence, the sending of Commissioners abroad to seek foreign aid, were all the acts of Congress—a body of deputies elected or appointed by the separate States or municipalities, but still acting for the whole body of States as one nation, or one people. No one of the colonies, so far as we are aware, ever declared its independence of the mother country. That act was the joint act of all. The different colonies raised regiments of troops within their own jurisdiction, but when placed in the field they were under the command of

Generals appointed by the Central Government. At the begin-
ning of the Revolution there was no written law or Constitution
defining or limiting the power of Congress. The Government
had no Courts, and no civil ministerial officers; it had, in fine,
no machinery for carrying its laws, decrees or resolutions into
effect. All laws had to be enforced by the machinery furnished
by the municipal governments of the respective colonies. They
were obeyed and enforced, as decrees of revolutionary tribu-
nals are usually enforced, by the universal consent of the
revolutionary party, and the general belief that any failure
to implicitly obey such mandates would cripple the efforts
of the revolutionists, and restore the former Government to
power.

At the very outset of the controversy with the mother
country it was foreseen if a separation took place some form
of government must be adopted for the seceding territory.
Not a government for each of the colonies, but a government
for the whole. After considerable delay, Congress, in the
month of November, 1777, finally adopted a written Constitu-
tion (usually called "Articles of Confederation") for the gov-
ernment of the new nation then struggling into existence.
This was submitted to the different colonies for their ratifica-
tion.

This was approved by the different Colonial Legislatures
from time to time. We believe most of them had approved
it by the Summer of 1778, but one State, Maryland, did not
approve it until the year 1781.

But Congress conducted its business in accordance with the
general provisions of that instrument both before and after its
approval by the separate colonies. That instrument shows as
near as may be the original form of government adopted by
the people of this continent when they threw off their alle-
giance to Great Britain.

Whilst the Articles of Confederation show that most of those
powers which are the usual attributes of sovereignty were
vested in the Central Government, in one particular the United
States Government, as then constituted, was entirely defective
as to its sovereign power. That Government could not enforce
its laws against individuals.

Maynard *v.* Newman *et al.*

When Congress passed a resolution it must call on the State authorities to enforce it. If the States neglected their duty the Government had no way to compel obedience to its mandates unless it were to make war on the refractory State. Private citizens were not responsible and amenable to the laws of the United States. Under this state of things the States generally. obeyed (at least partially) the orders of Congress during the war.

At the conclusion of peace the States became negligent or refractory, and in many instances utterly disregarded the resolutions of Congress. It was evident to all that a government of this kind must fall to pieces as soon as the outside pressure of war and foreign difficulties was withdrawn.

A Constitutional Convention was therefore called to create a stronger and better regulated government for the new State.

That Convention adopted a preamble in these words: "We, the people of the United States, in order to form a more perfect union, establish justice, insure domestic tranquility, provide for the common defense, promote the general welfare and secure the blessings of liberty to ourselves and our posterity, do ordain and establish this Constitution for the United States of America."

The Convention then went on to confer on the United States Government all the principal powers it had possessed under the Articles of Confederation; such as making peace and war, sending and receiving embassadors, raising and maintaining armies and navies, etc., and expressly prohibiting these powers to the States. Besides these general powers, Courts were organized, and all the machinery provided for. enabling the Government to enforce its own laws without having to place itself in the humiliating position of beseeching the different States to carry its orders into effect. Under this Constitution the United States became a real sovereignty. The States, it is true, are commonly called sovereign States, but we are at a loss to know in what their sovereignty consists. They can neither make war nor peace, send nor receive embassadors, yield up nor acquire territory, nor protect their own citizens from seizure, trial and condemnation by the General Government for offenses against its laws. It appears to us as absurd

to talk about the sovereignty of a State where another Government has the right (we speak not of those acts which a stronger State may by force and violence exert towards a weaker neighbor)—the legal right to seize any of its citizens and subject them to trial. It is, however, useless to cavil about terms. We have only alluded to the general powers of the Federal and State Governments, in order that our views about the intent and effect of the constitutional provisions we shall have occasion to review, may be the more readily understood.

We have already seen that the preamble of the Constitution recites that it (the Constitution) is ordained and established among other things to "provide for the common defense" and "promote the general welfare" of the people of the United States. It goes on to provide for a legislative department of the Government, the mode of electing members to the two houses of Congress, manner of passing bills, etc., and then in section eight shows what shall be the powers of Congress. Section 8, as *usually* printed, reads as follows:

"Section 8. The Congress shall have power to lay and collect taxes, duties, imposts and excise, to pay the debts and provide for the common defense and general welfare of the United States; but all duties, imposts and excises shall be uniform throughout the United States;

To borrow money on the credit of the United States;

To regulate commerce with foreign nations, and among the several States, and with the Indian tribes;

To establish an uniform rule of naturalization, and uniform laws on the subject of bankruptcies throughout the United States;

To coin money, regulate the value thereof, and of foreign coin, and fix the standard of weights and measures;

To provide for the punishment of counterfeiting the securities and current coin of the United States;

To establish post-offices and post-roads;

To promote the progress of science and useful arts by securing for limited times to authors and inventors the exclusive right to their respective writings and discoveries;

To constitute tribunals inferior to the Supreme Court;

To define and punish piracies and felonies committed on the high seas, and offenses against the law of nations;

To declare war, grant letters of marque and reprisal, and make rules concerning captures on land and water;

To raise and support armies, but no appropriations of money to that use shall be for a longer term than two years;

To provide and maintain a navy;

To make rules for the government and regulation of the land and naval forces;

To provide for calling forth the militia to execute the laws of the Union, suppress insurrections and repeal invasions;

To provide for organizing, arming and disciplining the militia, and for governing such part of them as may be employed in the service of the United States, reserving to the States respectively the appointment of the officers, and the authority of training the militia according to the discipline prescribed by Congress;

To exercise exclusive legislation in all cases whatsoever, over such district (not exceeding ten miles square) as may, by cession of particular States, and the acceptance of Congress, become the seat of the Government of the United States, and to exercise like authority over all places purchased by the consent of the Legislature of the State in which the same shall be, for the erection of forts, magazines, arsenals, dockyards and other needful buildings; and

To make all laws which shall be necessary and proper for carrying into execution the foregoing powers, and all other powers vested by this Constitution in the Government of the United States, or in any department or officer thereof."

The 9th Section of the 1st Article of the Constitution limits the powers of Congress.

The 10th section limits the powers of the States.

These, perhaps, are all the clauses of the Constitution which we will be called upon especially to examine in this investigation.

It is claimed by respondents that the clause which gives Congress power " to coin money, regulate the value thereof," etc., confers on that body the right to emit treasury notes and make them a legal tender.

We have long disquisitions by counsel on each side of this question (we speak in general of counsel who have prepared briefs on this *subject*, and which have been laid before us, although some of them are not counsel in this particular case), as to the meaning of the words "coin" and "money." We have no hesitation in saying that to "coin money" means to fabricate it out of metallic substances. To emit stamped paper is not to *coin* money as the word is generally understood, nor as we think it was used in the Constitution.

On the other hand, we think *money* means anything which passes current as the common medium of exchange and measure of value for other articles, whether it be the bills of private or incorporated banks, Government bills of credit, treasury notes or pieces of coined metal. Money is anything which by law, usage or common consent becomes a general medium by which the value of other commodities is measured and denominated.

Paper money is distinguishable from other negotiable paper, such as notes, bills of exchange, etc., because it is always (after once put in circulation) payable to bearer not to order; because it is made to represent convenient amounts for the ordinary transaction of business, is printed and written on paper not easily worn out, and therefore capable of being passed from hand to hand for a long time without destruction. By general consent it is used and treated as money and not as negotiable paper. If one endorses his name on such note he does not thereby become responsible for the insolvency of the bank, but merely guarantees the note is not a counterfeit. Neither the Courts of law nor the community treat such paper as negotiable securities, but as *money*, something which is used as a general representative and measure of values.

But whilst we do not think that the power to "coin money" gives the power to print, fabricate or issue paper money, we have no doubt that this power exists as an incident to the general powers of the National Government. In the case of *McCulloch* v. *State of Maryland*, the question was raised whether the United States had the constitutional right to charter a United States bank.

The power of the Government to charter such an institution

was sustained by the unanimous opinion of the Supreme Court, at that time presided over by Chief Justice Marshall, a man of great purity of character, and probably the ablest jurist ever produced in the United States. He, in his opinion, sustaining the action of Congress in this case, clearly admits that there is no *express* grant of power to Congress to charter a bank, but ably argues that if the Federal Legislature is empowered and required to "levy and collect taxes, to borrow money, to regulate commerce, to declare and conduct a war, to raise and support armies and navies," and conduct generally all the external and many of the internal affairs of a great nation, it must, from the very necessity of the case, have the power of selecting the means to carry out these great powers.

That Congress having determined that a bank was necessary to the management of its fiscal affairs, it was therefore constitutional to charter such an institution to facilitate those operations. That the power to charter the bank resulted from the general nature of the express powers granted to Congress.

We think it would be difficult to show why, if Congress may charter a National bank, to facilitate the transaction of its legitimate affairs, it may not make treasury notes for the same purposes, and if it issues treasury notes, why it may not give to them such character as it sees fit. The same object is attained by the bank and the treasury notes. The Government is enabled to conduct its financial affairs more successfully with these aids than it can without them. We think, then, we might rest this case on this proposition: That Congress has heretofore exercised a power precisely similar to the one under consideration, and their action has been sustained by the highest judicial tribunal in the country, and this should no longer be considered an open question. But if it were an entirely new question, we would have no doubt on our minds as to the power of Congress. We have no access to many of the books we would like to examine in connection with this subject, but we propose with such aids as we have before us to look into the views of the framers of the Constitution in regard to the general powers of Congress.

When that clause of Section 8 of Article I. of the Constitution, which authorizes Congress to borrow money, etc., was

under consideration, it first read, "to borrow money and emit bills on the credit," etc.

Upon a motion to strike out "emit bills," the following debate occurred:

[We copy from Mr. Haight's brief in the case of *James Lick* v. *William Faulkner et al.*, pp. 73–4–5–6, not having Elliot's Debates within our reach.]

"Mr. Gouverneur Morris moved to strike out 'and emit bills' on the credit of the United States.

"'If the United States had credit, such bills would be unnecessary; if they had not, unjust and useless.'

"Mr. Butler seconds the motion.

"Mr. Madison—Will it not be sufficient to prohibit the making them a tender? This will remove the temptation to emit them with unjust views; and promissory notes in that shape may in some emergencies be best.

"Mr. Gouverneur Morris—Striking out the words will leave room still for notes of a responsible minister, which will do all the good without the mischief. The moneyed interest will oppose the plan of Government, if paper emissions be not prohibited.

"Mr. Gorham was for striking out without inserting any prohibition. If the words stand, they may suggest and lead to the measure.

"Mr. Mason had doubts on the subject. Congress, he thought, would not have the power unless it were expressed. Though he had a mortal hatred to paper money, yet, as he could not foresee all emergencies, he was unwilling to tie the hands of the Legislature. He observed that the late war could not have been carried on had such a prohibition existed.

"Mr. Gorham—The power, as far as it will be necessary or safe, is involved in that of borrowing.

"Mr. Mercer was a friend to paper money, though in the present state and temper of America he should neither propose nor approve of such a measure. He was consequently opposed to a prohibition of it altogether. It will stamp suspicion on the Government to deny a discretion on this point. It was impolitic also to excite the opposition of all those who were friends to paper money. The people of property would

be sure to be on the side of the plan, and it was impolitic to purchase their further attachment with the loss of the opposite class of citizens.

"Mr. Ellsworth thought this a favorable moment to shut and bar the door against paper money. The mischief of the various experiments which had been made were now fresh in the public mind, and had excited the disgust of all the respectable part of America. By withholding the power from the new Government, more friends of influence would be gained to it than by almost anything else. Paper money can in no case be necessary. Give the Government credit, and other resources will offer. The power may do harm, never good.

"Mr. Randolph—Notwithstanding his antipathy to paper money, could not agree to strike out the words, as he could not foresee all the occasions that might arise.

"Mr. Wilson—It will have a most salutary influence on the credit of the United States to remove the possibility of paper money. This expedient can never succeed while its mischiefs are remembered, and as long as it can be resorted to it will be a bar to other resources.

"Mr. Butler remarked that paper was a legal tender in no country in Europe. He was urgent for disarming the Government of such a power.

"Mr. Mason was still averse to tying the hands of the Legislature altogether. If there was no example in Europe, as just remarked, it might be observed on the other side that there was none in which the Government was restrained on this head.

"Mr. Read thought the words, if not struck out, would be as alarming as the mark of the beast in Revelations.

"Mr. Langdon had rather reject the whole plan than retain the three words, 'and emit bills.'

On the motion for striking out: New Hampshire, Massachusetts, Connecticut, Pennsylvania, Delaware, Virginia, North Carolina, South Carolina, Georgia. Ayes, 9.

"New Jersey, Maryland. Noes, 2.

"The clause for borrowing money was agreed to nem. con. Adjourned."

To this report the editor adds the following note:

" This vote in the affirmative by Virginia was occasioned by the acquiescence of Mr. Madison, who became satisfied that striking out the words would not disable the Government from the use of public notes, as far as they could be safe and proper, and *would only cut off the pretext for a paper currency, and particularly for making the bills a tender either for public or private debts.*"

This debate shows that 'whilst a decided majority of the Convention were in favor of striking out the words " emit bills," they were induced to favor the motion by various motives. Some wished to deprive Congress of all power to issue paper money. Others did not wish to deprive Congress of the power to issue bills of credit or paper money, but only to strike out those words, lest their retention should be construed into an invitation to Congress to introduce a system of paper bills of credit as a circulating medium, which nearly all thought would not be advisable in the then situation of the country. But whilst the clause was stricken out there were unmistakable intimations by several members that still the Government would have the *right* under certain exigencies to issue such bills.

The 9th section contains the limitations upon the power of Congress. In that section there is no limitation or restriction prohibiting the issuance of bills of credit or of making them a legal tender. As this question was brought to the attention of the Convention in the discussion of the VIIIth Article, and as it was distinctly claimed that Congress would have power to issue bills of credit under its general power, without any special grant, it appears to us that the restriction would have been imposed in the 9th section, if the Convention had not been satisfied that it was improper and unwise to do so.

We will probably be answered that the theory on which the Constitution was framed was, that the Congress should possess no power but what was specially granted to it; that it would be idle to say Congress should *not* have such a power. Such a clause would be marring the symmetry of the instrument and inserting useless and nugatory words. That the 9th section was intended to limit the exercise of powers expressly granted in the 8th section, but not to prohibit the exercise of

powers *never* granted. This argument is plausible, but certainly not sound in its application. The 9th section not only limits powers *expressly* granted in section 8, but also limits the action of Congress on subjects to which no allusion is made in section 8. One of the prohibitions is in these words : " The privilege of the writ of *habeas corpus* shall not be suspended unless when in case of rebellion or invasion the public safety may require it."

Now there is certainly nothing in section 8 which expressly gives to Congress the right to suspend the writ of *habeas corpus*. If section 9 was only intended to limit and explain the express powers granted in section 8, why was this clause introduced ? The only possible way to explain the presence of this clause is to suppose that the Convention understood and knew that the Government must, to sustain itself and perpetuate its existence, assume many powers that were not *expressly granted*. That it must assume and exercise them as auxiliary to and resulting from those great powers which were expressly granted. They supposed, probably, that in times of difficulty the Government would be compelled occasionally to suspend the writ of *habeas corpus*, as the British Government under such circumstances had done. Whilst they were not willing to deprive the Government of that power, they were disposed to restrict it as far as compatible with the public safety. So, too, with regard to bills of credit; whilst the Convention was unwilling to *invite* Congress to introduce a paper currency, by inserting such powers among the express grants, they were equally *unwilling* to deprive them of that power if the exigencies of the nation required its exercise.

When we look to the 10th section, which contains the limitations on State authority, we find the States are prohibited from emiting bills of credit, or making anything but gold and silver a legal tender. So the subject was again and again called to the attention of the Convention. Their deliberate intention seems to have been to prohibit these powers to the States and *not to prohibit* them to the General Government. But whilst the Convention, of set purpose (and not, as it appears to us, either from an oversight or the desire to preserve the symmetry and consistency of the instrument), refused

to prohibit these powers to the Government, it also refused to make an express grant thereof. Not only was there no prohibition against the exercise of such authority contained in the 9th section, but no one ever proposed, so far as we can see with the lights before us, to insert such a clause. It seems to have been left with the tacit understanding that such a power might be claimed at some future day, and that it should be left to others to decide whether, under the general powers conferred on Congress, this power to issue notes and make them a circulating medium could be excercised.

Similar powers have been exercised by the General Government from its first institution, and they have been sanctioned by all departments of the Government, legislative, Executive and judicial. Two United States banks have been chartered, and treasury notes or bills of credit have been issued several times heretofore. Congress has repeatedly passed Acts declaring sometimes one kind of money and sometimes another shall be a legal tender; sometimes silver, at others gold; sometimes foreign, and sometimes domestic coin. The constitutionality of these Acts have never been seriously questioned. At least it has been the uniform practice of Government for more than three-quarters of a century to make, alter and modify the law in regard to what shall be a legal tender, and those laws have uniformly been submitted to and acknowledged as the law of the land. If Congress can make gold or silver a legal tender, it certainly can make copper, lead or iron a legal tender. If it may make copper a legal tender, why not stamped paper, or any other article?

The Constitution prohibits the States making anything but gold or silver a legal tender. But there is no such limitation on the powers of Congress. There certainly is no power conferred on Congress in express terms to make anything a legal tender. The power to make laws on this subject must be exercised as one of the subordinate powers arising from the general nature of the more extensive and important powers granted. The uniform practice of Government in regard to such powers, and the acquiescence of the people for seventy-five or eighty years, is certainly sufficient to establish this as a constitutional power.

There is one clause of the Constitution to which reference is seldom made in investigating the power of Congress, and one which, in our opinion, has never received that attention or consideration to which it is entitled.   As usually printed, that clause reads :

" Section 8. The Congress shall have power to lay and collect taxes, duties, imposts and excises, to pay the debts and provide for the common defense and general welfare of the United States ; but all duties, imposts and excises shall be uniform throughout the United States."

But Mr. Justice Story, in speaking of the phrase " to pay the debts, and provide for the common defense and general welfare of the United States," uses this language : " An attempt has been sometimes made to treat this clause as distinct and independent, and yet as having no real significancy, *per se,* but (if it may be so said) as a mere prelude to the succeeding enumerated powers.   It is not improbable that this mode of explanation has been suggested by the fact that in the revised draft of the Constitution in the Convention, the clause was separated from the preceding exactly in the same manner, as every succeeding clause was, namely : by a semi-colon and a break in the paragraph ; and that it now stands in some copies, and, it is said, that it stands in the official copy with a semi-colon interposed."   (Story on Constitution, sec. 912, vol. 1.)

According to Mr. Story the sentence should be printed thus : " The Congress shall have power to lay and collect taxes, duties, imposts and excises ; to pay the debts and provide for the common defense and general welfare of the United States ; but all duties, imposts and excises shall be uniform throughout the United States ;" or thus :

" The Congress shall have power to lay and collect taxes, duties, imposts and excises ;

" To pay the debts, and provide for the common defense and general welfare of the United States ;

" But all duties, imposts and excises shall be uniform throught the United States."

Either of these sentences are very different from the one we find in the present printed copies of the Constitution   If the phrase " to pay the debts, and provide for the common defense,"

etc., was separated into a distinct paragraph, no one (unless it was a blind and insane partisan politician) could read it without understanding that it was a distinct power granted to Congress to provide for the common defense, etc., and not a mere qualification of the power to levy and collect taxes. If the word "excises" is followed by a semi-colon instead of a comma, it appears to us the most natural and obvious understanding of the sentence would be, that it was an independent grant of power, and not a qualification of the power to tax. If we take it as it is now usually printed—the word "excises" being followed only by a comma—then the sentence becomes a most obscure and puzzling one. It is capable of either interpretation. It might, without any violence to the language as printed, mean either that Congress should possess the power generally " to pay the debts and provide for the general welfare," etc., or it might mean Congress shall have the power " to levy and collect taxes, etc., *wherewith* to pay the debts and provide for the common defense," etc. But even as the Constitution is now printed, we think the former interpretation the more rational one. The preamble recites that the Constitution is ordained and established, among other things, " to provide for the common defense and promote the general welfare." If such were the objects of framing the Constitution, what more natural than to grant to Congress the power to carry out those objects? But it is argued if these general powers were granted to Congress, it included everything necessary for the maintenance of a Central Government, and that the other special grants of power in the subsequent portions of section 8 were entirely unnecessary. To this argument we answer : Congress might under this general grant of power pass any laws that were *necessary* or *proper* for the common defense or general welfare. But the question would constantly recur upon each proposed law, is this *necessary* or *proper* for the common defense or general welfare ? May it not be better to leave this to the local legislation of the different States ?

Upon those points where the Convention thought it best that the laws should be uniform throughout the United States, express power was granted to Congress so as to forever stop the question of the constitutionality of such laws being raised.

Maynard *v.* Newman *et al.*

Upon other points it was left to time and experience to determine whether such power was necessary or proper to be exercised to carry into effect the great objects of the Constitution. This seems to have been the view taken of the Constitution by many members of the Convention, including James Madison, that great advocate of State rights and strict construction—a view entertained by him whilst he was framing the Constitution, as will appear from the extract from Elliot's debates upon the discussion in relation to striking out the words "emit bills." Any views he may have expressed afterwards when engaged in a heated political controversy would be entitled to very little weight.

The Constitution, as interpreted by those in power, has usually conferred on Congress and the Executive all the powers necessary to conduct the affairs of a great nation; to protect that nation from foreign aggression and domestic insurrection. As interpreted by one of the great political parties of the country, *when out of power*, it has merely been held as a compact among a multitude of sovereign and independent nations, with this singular feature in the compact, that each nation included within the league should have the right to interpret the compact for itself, and to violate it at pleasure, in any or all particulars; and to be wholly irresponsible to the other members of the league for such violation; not even to be liable to the penalty of war for the violation of its duties.

We cannot suppose that the wise and great men who framed the Constitution ever intended to do anything so absurd as to make a compact without providing the means to enforce it. But the same men who, when out of power and hopeless of obtaining it, have interpreted the Constitution so as to make of it nothing but an absurd nonentity, have, when *in power*, exercised under it all the powers ever claimed for the United States by the most ardent supporters of a strong National Government.

Giving, then, what we believe to be a fair and just interpretation to the Constitution, we think that clause which empowers Congress to pass all laws "which shall be necessary and proper for carrying into execution the foregoing powers" should have a most liberal construction.

That Congress, under this general power, and indeed from the very nature of the general powers granted, has the right to pass all laws that may be necessary, proper, *convenient or useful* in carrying out the special powers granted. That such has been the interpretation generally put upon the Constitution by all branches of the Government (legislative, judicial and Executive) from the first hour of its institution down to the present time, is undoubtedly true.

Usage and general consent is allowed great weight in interpreting all laws. Courts are always reluctant to overturn a long established rule, and will not do so unless the necessity is apparent. The reasons for applying the rule *stare decisis* to questions of constitutional power are much stronger than in other cases. The legislative department of our Government having exercised certain powers for a long series of years, commencing with the very first establishment of the Government, and those powers during all that time having been sanctioned by the co-ordinate branches of the Government, it would be little short of revolution for Courts, at this late day, to decide such powers were usurped. This Court is not disposed to inaugurate any such system of revolutionary decisions.

We hold, then, that Congress had the power to pass the law under discussion, not because such power is specially granted, and not because it pertains especially to any one of the powers granted, but because it is a law "necessary and proper" to be passed in carrying out the general system of government with which Congress is intrusted.

It has been a matter of reproach to those who claim that the General Government may exercise such powers as are now under discussion, that they do not agree among themselves as to the source of power in that Government. It is true there is such disagreement, and that is one indication that the advocates of this power may be wrong.

But are the advocates of State rights any more consistent in their arguments? One counsel, whose brief is before us, seems to admit (and really we cannot see how such an admission can be avoided) that the United States might *coin* tin, copper or lead, and call that money. That if the General Government can make anything a legal tender (which is

doubtful), it might make tin, lead or copper a legal tender, but thinks the odium attached to such a course would prevent the Government from doing so.    But this counsel thinks it clear that Congress has no power to emit bills of credit.

Another counsel, equally learned and earnest in his argument, admits Congress may issue *bills of credit*, but scouts the idea that Congress may make anything but gold or silver (or precious metals as he terms them) a legal tender.  He seems not to question that Congress may make the *precious metals* (we suppose he means gold and silver, although several other metals are more valuable than silver) a legal tender. Yet there is no express power given to Congress to make these metals, or either of them, a legal tender.    There is no prohibition against Congress making anything else a legal tender.

Either Congress has or has not power to declare what shall be a legal tender.    If Congress has the power, it either derives it from the clause which confers the power to coin money and regulate its value, or else it is one of the resulting powers naturally arising from the grant of other powers.    If derived from the power to coin, etc., then it may well be contended Congress could only make *coined* money a legal tender; but even then they might make copper, which is certainly a coined money, the *only legal tender*, to the exclusion of both gold and silver.    If, on the other hand, it is a resulting power derived from the general powers of the Government, Congress might make wheat, tobacco, or any other commodity, a legal tender.

Finally, the learned counsel, as a climax to his argument against the power of Congress to make anything but what he terms precious metals a legal tender, uses this language :

"Again, if Congress can, by impressing the Federal stamp on paper, give it a valid character as a circulating medium, why may .it not, by the same means, give to a piece of lead, iron, tin, or to any other base metal of equal weight to some gold coin, the legal character of money, and compel men to receive it at its nominal value, however much that might be in excess of its real worth ?    Or, to apply a certain test, a sort of '*experimentum crusis*,' why may not Congress, following the example of certain tyrants of the middle ages, debase the current coin, so that a coin having only one-half of the proper

quantity of gold and silver would be made to pass for double its value ?"

We think we have already shown that Congress may make money of any kind of metal, even of those base metals of which the gentleman speaks so contemptuously.

But can Congress *debase the currency ?* We had supposed on this subject there could be no possible room for doubt. Congress has power to coin money and regulate the value thereof.

If it can regulate the value of money, it may increase or diminish the weight of the metal to be used in fabricating any coin of a given value or denomination.

The Congress of the United States in 1834, did debase the gold coin of the country, to the extent of about six per cent., or a little more. By the law of 1792 the eagle contained two hundred and forty-seven and one-half grains of pure gold, or two-hundred and seventy of standard gold, the alloy being one-twelfth or eight and one-third per cent. of the whole. In 1834 the weight of the eagle was reduced from two hundred and seventy grains to two hundred and fifty-eight grains. At the same time the alloy was increased from eight and one-third per cent. to ten per cent. of the whole, so that after 1834 the eagle contained only two hundred and thirty-two and one-fifth grains of pure gold, or six per cent. and a fraction less than the old eagles. Yet until we saw the brief in this case we certainly were not aware that any one ever questioned the *power* of Congress to make this debasement. The policy of the Act of 1834 was fiercely assailed at the time; but if the constitutionality of the Act was questioned, and it came within our observation at the time the Act was passed, we have utterly forgotten it.

If, then, the arguments in favor of the constitutionality of the Act are often contradictory and unsatisfactory, those opposed to it are equally so.

We are gravely invoked to hold this law unconstitutional because of its being unjust, oppressive and impolitic. We are told that the issuance of paper promises to pay which are not redeemed according to the promise on the face of the paper is but a fraud and a swindle; that it is a most

outrageous fraud to compel creditors to take such paper in payment of their debts; that such a dishonest and unfair law cannot inure to the benefit of the Government; that the issuance of such money does not add to the resources of the Government, or aid it in any manner in conducting its military or financial operations; that it should never be presumed that powers were granted to the Government which could in no case result in benefit or advantage to the nation at large, but could only be used as a means to enable one portion of the community to commit the most glaring frauds on another class.

Doubtless Courts always endeavor to so interpret all laws—whether those contained in the Constitution of the General Government and several States, or those enacted by the National and State Legislatures—as to avoid glaring injustice; and no principle could be more just. For in the interpretation of laws and of contracts one principle should always guide the Courts in preference to all others, that is, to carry out the intention of the contracting parties or of the lawmakers, whether Constitutional Conventions or legislative bodies.

It should never be inferred that any law-making power intended to perpetrate an act of injustice unless the language of the law is such that it is impossible to so interpret it as to avoid injustice. If, then, we were thoroughly convinced that the power claimed for Congress could, when exercised, only result in unmitigated evils, injustice and oppression, without any possible countervailing advantages, and that these propositions are too clear for doubt or argument, as counsel seem to assume, then, indeed, would we hesitate to sustain the power.

We might content ourselves here by saying that we differ totally from counsel in regard to the wisdom, justice and policy of the law under discussion. That there being a variety of opinions as to the justice and propriety of the law, all argument on this point should end here; but since so much has been assumed in this argument in regard to the absurdity and injustice of the law under discussion, it may not be improper for us to make some suggestions as to the wisdom, beneficence and absolute necessity of the act.

We think it would require a man to be very ignorant, or possessed of a great deal of hardihood, to say the Colonies could have successfully conducted the Revolutionary War without the use of continental paper money. Even in our present struggle, with all the immense wealth and resources of the country, we think it would be difficult for any one to show how the Government could have procured the means to conduct the present civil war to a successful termination without a resort to some system of Government paper money.

That it was wise policy, and in accordance with the dictates of justice and humanity, to make it a legal tender, we have never doubted. The making it a legal tender gave this currency an additional value, and to some extent checked its depreciation. Besides this, the banks had suspended and locked up their gold in their vaults; the great bulk of the coin of the country was thereby withdrawn from circulation. A panic was created, and a great portion of that not in the banks was hid away and hoarded by individuals. The Government in order to conduct the war in which it was engaged, was bound to have large sums of money. A portion of that money must be in gold. If the Government borrowed from the banks they must expand their circulation.

Such a course by suspended banks would have destroyed confidence in their solvency, and the bills would soon have become worthless. The demand for gold would have been increased; its value would have become greatly enhanced as compared with all other species of property. The whole debtor class of the community would have become insolvent, the business of the country would have been paralyzed, general distress and misery would have been brought on the country, and the people in despair would have given up the contest in which they were engaged. By adopting the Government currency a circulating medium was furnished, which, although greatly depreciated, was much better than bank notes would have been, had the banks so extended their circulation as to loan to the Government all the money it needed. By making the treasury notes a legal tender, the demand for gold was diminished and the debtor classes were saved from utter ruin. That such a policy was a wise one is evidenced by

Maynard *v.* Newman *et al.*

the universal prosperity of the Eastern States.    Under such a system commerce, manufactures and agricultural pursuits have all been stimulated.

Although more than a million of men, and they the most active, healthy, and able bodied of the people, have been withdrawn from the ordinary pursuits of life to prosecute the civil war in which the Government is involved—although two hundred millions of debt due from the Southern States to the Northern States was confiscated less than four years since; notwithstanding the immense burthens of taxation imposed on the loyal people of the North by this war, still the people, encouraged and stimulated by a reliable and abundant circulating medium and the liberal policy of the Government, have by their unwonted energy and industry, swelled the agricultural products of the country to an amount far exceeding anything we produced before the war.

Manufactures of every kind, except cotton fabrics, have been greatly extended.    Commerce never was more flourishing. The general wealth of the country has been immensely increased.

Search the history of the world from the earliest dawn of civilization to the present day, and it will be impossible to point to a time or place where twenty millions of people were so universally prosperous as the people of the Eastern States have been within the last two years.    Every species of labor and industry has been rewarded.    Employment has been found for all who were able and willing to engage in any useful occupation.    Never, in any other age or country, have the people generally been able so readily to procure all the necessaries and many of the luxuries of life.

However absurd theorists may prove the Government system of finance to be, however objectionable it may be to that class of political economists who predicted that grass would grow in the streets of all northern cities, and the whole Northern people would sink into poverty, distress and want, if they attempted to suppress the rebellion, we cannot think a system utterly foolish, immoral and unjust which has produced such results as we have witnessed in the last two years.

The order of the Court below is affirmed.