## In the matter of the maintenance and ownership of the Newark plank road and bridges.

[Filed September 8th, 1902.]

1. The duty imposed on the court of chancery by *P. L. of 1902 p. 566,* to hear a petition for the apportionment between the counties interested of the expense of maintenance of a plank road running into two or more counties, after the charter of the plank road company had expired, is judicial and properly imposed on such court.

2. Where, on the expiration of the charter of a plank road company, owning a road partly in each of two counties, it becomes necessary, under *P. L. of 1902 p. 566,* to apportion the expense of maintaining the road between such counties, and the citizens of one of the counties use the road in traffic which merely passes through the other county without any benefit thereto, and the remainder of the use is of equal benefit to each, the expense should be apportioned by ascertaining the proportion of such through traffic to the total use of the road, and charge such proportion of the expense, with one-half of the remainder, to the county engaged in such through traffic, and charge the other half of the remainder to the other county, though more of the road may be in one county than in the other.

3. Where, on an application to apportion the expense of maintaining a plank road running into two counties after the charter of the company which built it had expired, under *P. L. of 1902 p. 566*, it appears that the use of the road was equally beneficial to each county, except that the citizens of one county also used it for traffic which merely passed through the other county, without any benefit thereto, it is incumbent on the latter county to show the proportion of such through traffic to the total use of the road, and the proportion of the expense to be charged therefor to the other county.

On petition.

The Newark Plank Road Company was incorporated by special act of the legislature, approved February 24th, 1849. Under the provisions of its charter and supplements the company constructed a continuous highway from the city of Newark to the Hudson river, in Jersey City. The portions of the road within the limits of Newark and of Jersey City were, in time, to a large extent, abandoned to those respective municipalities. The highway which remained in the control of the company, and which was operated by it as a toll road, consisted of the two bridges over the Passaic and Hackensack rivers, respectively, and a plank roadway laid across the tidal meadows through which those rivers flow. From the beginning of the planking at the Newark terminus to the end thereof at Jersey City the nature of the ground is such that this highway is of very little use to the adjacent territory through which it passes. The total length, including the bridges, is eleven thousand five hundred and 'one and six-tenths feet, less than two and a quarter miles. The Passaic bridge, including its approaches, is seven hundred and eighty-nine and two-tenths feet long. The Hackensack bridge, with its approaches, is one thousand six hundred and eighty feet long. This latter bridge lies wholly within the limits of Hudson county, the Passaic river being the boundary between the two counties. More than a fifth in length of this composite highway consists, therefore, of bridges over navigable rivers, each of which is necessarily provided with a draw. Of the entire highway, measuring from the centre of the Passaic river, five thousand eight hundred and ninety-eight and nine-tenths feet lie within Hudson county and two thousand nine hundred

and two and seven-tenths feet lie within Essex county. A little more than a quarter in length thus belongs to Essex county and a little less than three-quarters to Hudson county. The land lying on each side of this highway and extending for a long distance therefrom has remained practically unoccupied, and shows at present little indications of being ever extensively applied to any useful purpose. Although the road has been open and in use as a great artery of commerce for many years, hardly any traffic is supplied from the land adjacent to the portion of the orginal highway under consideration in these proceedings. On account of the maintenance of guards and of the trolley road, which will be referred to hereafter, access from this adjacent territory to the plank road at present is practically excluded, excepting at a few points where special provision is made for such access. The evidence fairly establishes the fact that there is no intersecting public highway throughout the entire course of the plank road. There is one factory in Essex county, situate on the west bank of the Passaic river, which has the benefit of access to the plank road by a private roadway. There are three manufacturing establishments in Hudson county, between the two rivers, which use the plank road in a similar manner. There is also a public-house in Hudson county, on the east side of the Hackensack river, resorted to by fishermen, which may be said to be connected with the uplands by this plank road only. Near the same place access to the plank road is provided for "a number of people" who gather hay on the adjacent meadows. In all these instances where the plank road is used in connection with the adjacent land special means of passage over the canal, trolley road or roadway, guards are provided. The factories seem to have docks upon the rivers, and the evidence indicates that their use of the plank road is not extensive, their principal instrument of commerce being the rivers or tracks connecting with the steam railways.

By virtue of comparatively recent legislation the Newark Plank Road Company became authorized to lay out and operate a horse railroad on the side and along the line of its road, so as not to obstruct the use of the plank track by vehicles. It appears that the whole width of the right of way of the company

is forty-eight feet, of which only about eighteen feet is occupied by the plank track for ordinary vehicles. By shifting this plank portion in some places, a convenient strip was left on each side for a railway track of the usual steam railway construction. These tracks are built independently of the plank roadway, and occupy the roadway only at the draw of each bridge, or, in one case, for a short distance further. When the tracks come to the river they are projected on practically independent trestles out into the stream as far as the draw, where they converge, so as to run across the draw parallel with each other and near together, like the trolley tracks of a city street. Beyond the draw the two tracks then diverge and resume their former relative positions with the whole of the plank roadway and its guards between them unaffected by their presence or use. For some years past the plank road company has been running electric cars over its tracks, which connect with the tracks of the Newark and Jersey City street railway systems, thus affording convenient transportation of passengers between all points in Newark and all points in Jersey City, to the apparent equal advantage of each city. The electric cars are very heavy, but do not in any way wear or otherwise affect the plank trackway for ordinary vehicles, excepting while passing over the draw of each bridge.

In the year 1900, in certain *quo warranto* proceedings, the charter of the Newark Plank Road Company was held to have expired by limitation, and that the company continued in existence only for the purposes of settling its affairs, disposing of its property, dividing its capital, &c., under section 53 of the present Corporation act. *Grey* v. *Newark Plank Road Co., 36 Vr. 51; S. C. on appeal, 36 Vr. 603.*

To endeavor to meet the complex situation of the Newark Plank Road Company and the Newark plank road brought about by this judicial action, the legislature passed two acts in 1901 and one act in 1902. *P. L. of 1901 ch. 133, 134; P. L. of 1902 ch. 173.* The laws passed in 1901 were approved upon the same day, March 22d, 1901. *P. L. of 1901 p. 290.* One of these laws (*P. L. of 1901 ch. 134*) permits a plank road company, whose charter has expired, and which owns a railway operated as a street railway, to come under the provisions of the Traction act,

and operate its railway and continue its existence as if formed under that statute. It is assumed that the plank road company complied with this act forthwith, and the company claimed, in this proceeding, to be to all intents and purposes a railway corporation under the Traction act.

The other act of 1901 (*P. L. of 1901 ch. 135*) seems to contemplate that a road and bridges situate as are these should be taken possession of and be operated by the respective counties in which they lie, the county line being the division. Any bridge over a navigable stream between two counties is to be taken jointly by the boards of the two counties, and is to be acquired and operated at joint expense. The act provides, further, that if a bridge shall be used by any street railway company, such company can, by agreement, "undertake a part of the expense of repairing, rebuilding and building said bridge," and the board of freeholders and the railway company may, by agreement, fix the shares of such expense to be borne by the two parties, respectively. If no such agreement shall be made, either party is permitted "to apply, by petition, to the court of chancery, which court is given jurisdiction to hear the parties in a summary way" and to make an apportionment.

Under the provisions of the last-mentioned statute, without considering any contribution from the plank road company, as a street railway company, the share of the expense of acquiring and maintaining this plank road and both these large bridges which would be thrown upon the county of Hudson would be much greater than that cast upon the county of Essex. The whole of the large bridge—that over the Hackensack river—half of the comparatively small bridge over the Passaic river and more than one-half of the plank roadway not on these bridges would have to be acquired and maintained at the expense of Hudson county, while it was claimed that the maintenance of this highway was far less beneficial to her than to her sister county.

The act of 1902, it is fair to infer, was intended to relieve the county of Hudson from the hardship inflicted upon her by the former legislation. This act (*P. L. of 1902 p. 566*) provides that whenever the road and bridge or bridges of any plank road

company included within the terms of the former act (the act of 1901) "constitute a continuous highway in any two or more counties of this state," it shall be the duty of the boards of freeholders of such counties

"to acquire, maintain and operate such road and bridge or bridges at joint expense, and said boards may, by agreement, divide the expense thereof between such counties in such proportion as they may deem just, notwithstanding the share of such expense agreed to be borne by either of such counties may be more or less than the cost of acquiring, maintaining and operating the portion of such road or bridges located within the limits of such county."

The act further provides that if no such agreement shall be made, the boards of freeholders, or either of them, may "apply, by petition, to the court of chancery." The same language is used to define the jurisdiction of the court to apportion the proportions of expenses to be borne by the two counties, as is above quoted from the act of 1901, prescribing the apportionment of expense to a street railway company.

The present petition was filed, in terms, under the act of 1902. The plank road company and the North Hudson Street Railway Company, which latter is understood to be actually operating the electric cars, under lease or otherwise, were finally both brought into the proceedings and made parties thereto, in order that both the apportionment between the public authorities and the railway company under the act of 1901, and the altogether different apportionment between the two counties under the act of 1902, might be made at the same time. It was admitted that the parties interested in these two apportionments were unable to come to any agreement. After the testimony had been taken, by consent of all four parties, an order was made striking out the plank road company and the North Hudson Street Railway Company as parties to the proceeding, and providing for any necessary amendment to confine the question to be determined by the court in this case strictly to the proportions of expense to be borne by the two counties, respectively.

It is not necessary to ascertain what property rights, if any, the Newark Plank Road Company has in this roadway and bridges, or what the cost will be of acquiring or extinguishing

such rights. Whatever the cost of acquiring, maintaining and operating this road and these bridges may be, all that is to be determined in this proceeding is the ratio in which this expense is to be divided between the two counties.

*Mr. Joseph L. Munn,* for the board of chosen freeholders of the county of Essex, petitioners.

*Mr. John Griffin,* for the board of chosen freeholders of Hudson county.

*Mr. Spencer Weart,* for the Newark Plank Road Company.

*Mr. James B. Vredenburgh,* for the North Hudson Street Railway Company.

STEVENSON, V. C.

Although various hints, during the argument, were made in regard to constitutional questions which might be discussed in this proceeding, no argument has been made which was not addressed to the single question how this burden of expense should, in equity, be apportioned between the two contending counties. This, therefore, is the question which I propose to consider and decide, after referring to a single preliminary matter too important to be passed in silence.

*First.* It was hinted, in the argument, that the apportionment of this expense is not a judicial duty which the legislature can cast upon the court of chancery. Without discussing this matter at length, I shall proceed upon the theory that the duty, under the act, which this court is called upon to perform is judicial, and not administrative or executive, in its nature, and that the extension of the judicial duties of the court to the subject-matter covered by this statute is "in harmony with its character," and does not impair its "essential qualities." *Harris* v. *Vanderveer's Executors, 6 C. E. Gr. 424, 427 (Chief-Justice Beasley).* The following cases will abundantly illustrate the manner in which similar statutes, imposing similar duties upon the courts, have been passed by our legislature and recognized and enforced by

In re Newark Plank Road and Bridges.

our courts: *Somerset* v. *Hunterdon, 23 Vr. 512 (Bridge act, 1894)*; *New York, &c., Railroad Co.* v. *Atlantic and Electric Railway Co., 10 Dick. Ch. Rep. 522 (Trolley Crossing act, 1895)*; *Palmyra Township* v. *Pennsylvania Railroad Co., 17 Dick. Ch. Rep. 601 (Act for protection of railroad grade crossings, 1898)*; *Board of Health* v. *Diamond Mills Paper Co., 18 Dick. Ch. Rep. 111 (Anti-pollution act, 1899)*.

In the case of *Somerset* v. *Hunterdon,* first cited above, the statute constituted a justice of the supreme court a special tribunal to decide as to the character of the new bridge, or the materials with which it should be constructed, where the two boards of chosen freeholders which were charged with the duty of building the bridge, and agreeing upon those matters, failed, in fact, to agree. In this instance the new judicial duty was placed upon the justice of the supreme court, not upon the supreme court, and the decision of the justice, as a special and inferior tribunal, became reviewable by the supreme court upon a writ of *certiorari.*

In each of the other three cases above cited the statute extends the jurisdiction of the court of chancery to a novel subject. The legislature has not undertaken to designate the chancellor as a special statutory tribunal, and thereby subject his decision to review in the supreme court by *certiorari.* In this present case, as in the last three cases above cited, the statute attempts to extend the jurisdiction of the court of chancery. That it is competent for the legislature to make such extensions cannot be disputed. The question in every such case is whether the new judicial duty cast upon the court of chancery, to use the language of the late Chief-Justice Beasley, above cited, is "in harmony with its character and not a usurpation of the inherent powers of any other court."

Vice-Chancellor Grey, in the case of *Palmyra Township,* above cited, finds, evidently as the characteristic of the statute before him essential to sustain its validity, that the jurisdiction which it conferred "upon this court accords with its modes of procedure and is consistent with its general equity powers."

In view of the above-cited authorities, I shall not hesitate to endeavor to discharge the duties imposed upon the court of chan-

cery by this new statute, assuming that such duties (1) are judicial or "*quasi* judicial" in their character; that they are (2) in harmony with the nature of the court and its methods of procedure, and that (3) they have not hitherto been assigned to any other department of our government, and especially have not been committed exclusively to any other tribunal. *Paul* v. *Gloucester, 21 Vr. 586, 611; Palmyra Township Case, supra.*

*Second.* The first point to be ascertained is whether there is any principle, which has been recognized in New Jersey, governing the apportionment of the expense of the construction and maintenance of bridges among the communities which particularly enjoy the use of the bridge. It seems to be plain that the apportionment of this sort of expense between different towns or different counties has hitherto been made with reference to the relative advantages which the two municipalities derived from the improvement—with reference to the relative amount of *use* by each party. Of course, the principle is not capable of exact application. It may also be admitted that ordinarily a bridge connecting two municipalities is probably of equal advantage to each, and that equality, in respect of ownership and the burdens of ownership, should be assumed to be just, in the absence of evidence to the contrary.

There are repeated instances in the early legislation of the state, when the care of bridges was placed upon the towns, or was gradually being transferred from the towns to the counties, in which the legislature, evidently recognizing inequality of advantage and use, apportioned the expense of constructing and maintaining a bridge between two municipalities unequally, placing upon one party a much larger share than was cast upon the other.

In the act in relation to highways and bridges, passed in 1682, the construction and maintenance of highways and bridges were made the "charge of every respective person, town or township, to whom or where they are most serviceable, or do or shall most immediately belong or appertain." *Leam. & Spi. 257, 258.*

In the general act relating to roads and highways, passed in 1716, during the period when the general policy was to make the towns care for all bridges, and, where a bridge connected

two towns, to divide the expense thereof equally between such towns, the bridge over the Gloucester river was ordered to be repaired and maintained at the general charge of the county of Gloucester, because such burdens were considered "too heavy to be borne by the towns in which the said bridge is." The same act made a similar disposition of the bridge over South river, between Amboy and Burlington, in the county of Middlesex. *Bradf. 71; Kin. p. 69 §§ 16, 17; 1 Nev. 55.*

In 1727 the legislature provided for the building and maintenance of a bridge over the Bound brook, between the counties of Middlesex and Somerset, "at the equal expense of the county of Middlesex aforesaid and the two upper precincts of the county of Somerset." *Kin. p. 299 § 10; 1 Nev. 168.*

In 1730 the above-mentioned two towns in Somerest were relieved of their share of the burden of building and maintaining this bridge, and the entire expense was apportioned between the two counties, in the proportions of one-third part to Middlesex and two-thirds parts to Somerset. *Kin. 257; 1 Nev. 198.*

In 1741 the expense of maintaining bridges over the Passaic river, at different points between the townships of Essex and Morris on one side of the river, and the townships of Essex county on the other side, were apportioned between the Morris and Bergen townships and the whole county of Essex. *1 Nev. 275.*

In 1760, in the revised general act in relation to roads and bridges, which placed the burden of maintaining bridges, in many of the larger counties, upon the counties themselves, and transferred that burden from their towns, the expense of maintaining the Bound brook bridge, above mentioned, which then had been erected, was imposed, as before, one-third upon the county of Middlesex and two-thirds upon the county of Somerset. *2 Nev. p. 361 § 36.*

The same act (section 37) provided that thereafter the expense of repairing or rebuilding a bridge at Trenton should be apportioned between the county of Hunterdon and the township of Nottingham, in the county of Burlington, so as to impose two-thirds of such expense upon the county of Hunterdon and one-third thereof upon Nottingham township.

In re Newark Plank Road and Bridges.

One of the most striking illustrations of the apportionment of expenses pertaining to bridges, according to use and benefit, is presented by the act of November 28th, 1760. *Allin. L. p. 229.* This statute provided for the construction and maintenance of various bridges in certain highways leading to the city of Philadelphia. The locality of each bridge, whether in Burlington or Gloucester county, was, to a large extent, disregarded. The burden of construction and maintenance was distributed according to a special scheme, which plainly recognized the equitable liability of a remote community to aid in maintaining a bridge which was useful to it, although beyond its territorial limits. Almost all the townships of Burlington county were made, by this act, to contribute to the maintenance of bridges in Gloucester county.

After the burden of erecting and maintaining bridges had been finally placed upon the counties, and the townships had been relieved therefrom, and especially after the counties had largely increased in population and wealth, the instances of apparent inequality of use and advantage from bridges with which we are dealing would naturally become extremely rare. The control which counties have over the erection of bridges would also tend to prevent the erection or maintenance of a bridge or part of a bridge by one county for the undue advantage of another county.

The situation presented by this Newark plank road, and particularly by its bridges, is similar to some of the situations dealt with by the legislature during the colonial period of the state, to which I have referred. The peculiar character of this situation is recognized in the statute upon which the proceedings in this court are based.

Leaving out of view the very slight local use of this plank road from the adjacent property, which, apparently, is not likely to increase very soon, this entire composite highway, including the plank road and both the bridges, discharges substantially the same function as if it were a continuous bridge from the borders of Newark to the borders of Jersey City, spanning the rivers and meadow lands which lie between those points. That such is, to a very large extent, the nature of this highway was practically conceded in the argument. A bridge between these

two great cities, apart from special circumstances, presumably would be for the equal benefit of each place. Counsel for Hudson county offered evidence to show that the traffic over this highway was conducted very largely by citizens of Newark, in vehicles owned in Newark, and insisted that the expense of maintenance should be divided between the two counties, so far as it was to be borne by them, in proportion to the number of vehicles owned in each county and employed in conducting commerce over the road. This principle he deduced from the proposition that Hudson and Essex should share the expense in question in proportion to the benefits which they severally received from the use of the road. But such a deduction, in my judgment, is wholly unwarranted. The large vehicles belonging to the Newark bakeries that travel over this plank road, ladened with bread which they deliver in Jersey City, are engaged in a commerce which, according to every sound principle of political economy and common sense, must be deemed beneficial to both cities. Commerce, to be carried on continuously, must be beneficial both to the merchant and his customer. Crude notions to the contrary, at the present time, are, to a large extent, exploded. The argument urged by counsel that the distribution of bread in Jersey City from the Newark bakeries is injurious to the interests of Jersey City, because it competes with the manufacture of bread in that place, is fallacious. If the distribution of Newark bread to the citizens of Jersey City were not advantageous to those citizens, such trade would not be continued.

I know of no stronger reason which could impel a city, at its own expense, to extend a bridge to a foreign shore than the certainty that over such bridge its citizens would be supplied with better or cheaper food than otherwise they would enjoy.

It is, however, very plainly established in this case that there is a large volume of traffic over the plank road between the city of Newark and the city of New York, in which Jersey City is to a very slight extent, if at all, interested. In respect of this traffic the highway discharges the function of a bridge between the city of Newark and the great city of New York. Vehicles, with their loads of manufactured goods, start from Newark and,

46

after leaving the Jersey City end of the plank road, proceed directly to the ferries and then to customers or places of distribution in the city of New York. These vehicles use and wear the streets of Jersey City and enjoy police protection there, but do not seem, directly or indirectly, to bring any substantial trade or gain to the latter place. The course through Jersey City is short. Apart from the occasional trade connected with the transit of these vehicles and apart from the effect which they produce upon the business at the ferries, Jersey City is rather burdened than benefited by their transit through her territory. If, therefore, the proportion of the total traffic over the plank road which substantially belongs to commerce between Newark and New York can be ascertained, it seems to me that the practical problem presented in this case can be solved with approximate accuracy. The difficulty arises from the fact that the evidence does not show that a complete and satisfactory analysis of the traffic on this highway with reference to the point in question has ever been made. A partial analysis appears to have been made which throws some light upon the true character of the heaviest traffic—the traffic which wears the highway most— the traffic conducted by heavy trucks and business wagons. So far as the plank road is used by light vehicles, which may be called private carriages, including bicycles and automobiles, not used in transporting goods, there is no evidence in the case to justify the inference that the use of the road for such travel is not equally beneficial to the two cities.

The use of the road by foot passengers is of the same character, but the evidence strongly indicates that such use is slight.

In regard to the transportation of passengers in the electric cars, if such travel were over the plank road, it would constitute a very large item of beneficial use, to be equally attributed to the two counties whatever portion of the joint burden might afterwards be assigned to the street railway company. But these electric cars are operated upon independent tracks, which do not in any way affect the plank roadway, or even these large bridges over the rivers, excepting at or very near the draws in these bridges. If the apportionment of the expense of maintaining these bridges is made under the act of 1901, or under

any other statute, it is fair to suppose, from the nature of the case, that neither county will be put to much expense by reason of the passage of the electric cars over any part of this highway.

It is by no means certain that, if this highway were abandoned by the public, the street railway would not find means to continue the operation of its cars over its tracks and across these two rivers by means of its own, and that Jersey City would not continue to enjoy the convenience of this railway service, without assuming, as the price thereof, the acquisition and maintenance of the highway.

I think, therefore, that the fact of the transportation of passengers, in electric cars, over these bridges is presumably for the equal benefit of the two counties, while a factor to be considered in the problem which we are endeavoring to solve, is not a very important factor. I think the same is, in a measure, true of the light use of the road by foot passengers and comparatively light use by what may be called private carriages. It is shown that, during three days and two nights, out of one thousand eight hundred and fifty-four vehicles, eighteen were automobiles, one hundred were carriages—i. e., vehicles carrying passengers— one hundred and twenty-four were bicycles, while one thousand six hundred and twelve were trucks for carrying freight. During the same period there were five hundred and eight foot passengers. It would seem that the main problem reduces itself to the analysis of the commerce in which these trucks are employed. The question is how much of it is commerce between Newark and New York, and how much between Newark and Jersey City. The proofs on this subject are unsatisfactory. We have only the results of a single partial investigation, made for a brief period. This evidence, however, was accepted by both sides of the controversy as complete. Mr. Jackson, the superintendent of the plank road company, gave, as the result of his investigations, that eight per cent. of the trucks belong to Jersey City, twelve per cent. to New York City and eighty per cent. to Newark. This intelligent witness, however, stated, first, that he had no means of knowing how much of the traffic indicated by the eighty per cent. of Newark vehicles was between Newark and Jersey City, and how much of it was between Newark and New

York. He indicated, however, an opinion, founded, in part, upon observation, that a substantial portion of this traffic was between Newark and New York, only slightly and transiently affecting Jersey City. The witness showed that a considerable express business was carried on in wagons over this plank road between Newark and New York. There are, also, a large number of factories in Newark which convey their products, by trucks, over this highway to their places of distribution in the city of New York.

In regard to the twelve per cent. of the trucks which belong in New York, it is safe to suppose that very few, if any, of these vehicles are employed in any commerce between Newark and Jersey City. When we undertake to calculate what portion of the eighty per cent. of Newark trucks are employed in commerce between Newark and New York, we are without any exact measure or guide. That a very considerable proportion of the freight hauled from Newark factories, in Newark trucks, is transported immediately to New York, seems to be a fair inference from the testimony and from plain facts of which this court can take judicial cognizance. I think, however, that, with the evidence on this subject incomplete, although additional evidence seems to have been available, great caution should be observed in adopting any uncertain conclusion in favor of the county of Hudson. Commerce between two large cities like Newark and Jersey City may well be presumed to be equally beneficial to those cities, except so far as the contrary is proved.

If we take out twelve per cent. of this traffic by trucks, eighty-eight per cent. remains to be assigned to commerce between Newark and Jersey City and commerce between Newark and New York. The proportions of the burden to be divided, so far as they are ascertained by this single definite factor, would be forty-four per cent. to Hudson county and fifty-six per cent. to Essex county. But this calculation is manifestly incomplete. It would seem that the corrections are to be applied by a process of mind, which, to some extent, partakes of the nature of guessing. To deal with these indeterminate factors separately is not, in my opinion, the best method. Probably no two minds would give any of them exactly the same effect in figures; perhaps no two

In re Newark Plank Road and Bridges.

minds would independently reach precisely the same result in figures in regard to the whole problem to be solved.

Allowing the local use of the road its full force as tending to make the burden of Hudson county greater than that to be borne by Essex county, allowing, also, that the use of the highway by foot passengers and by the electric cars, bicycles, automobiles and other vehicles transporting passengers is equally beneficial to the two counties, and that therefore the traffic by means of trucks is not to be considered the only useful thing which is to be paid for—with these considerations and the presumption in favor of equality in view, I have reached the conclusion that this entire highway may be regarded as practically a bridge between Newark and New York City to the extent of something between twenty and thirty per cent. of its beneficial use by the public. Applying the best judgment which I can bring to bear upon the problem as a whole, with its definite and indefinite elements, I think the expenses mentioned in the petition may be divided between the two counties so as to impose five-eighths thereof upon the county of Essex and three-eighths upon the county of Hudson.

If the above result is, in fact, a hardship upon the county of Hudson, it must be, I feel sure, because a larger proportion of the traffic carried on in Newark trucks than I have allowed for is between Newark and New York City and only transiently affects Jersey City. But the definite proof on that subject, which the testimony showed was obtainable, was not produced, although, while there was still abundant opportunity to present such evidence, the views of the court in regard to its importance were most plainly expressed. In dealing, therefore, with this important factor in the problem to be solved, well-settled rules of evidence, I think, require that, if any mistake is probable, the mistake should not be to the injury of Essex county.